IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-848-F

| | | |
|---|---|---|
| TRANA DISCOVERY, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| SOUTHERN RESEARCH INSTITUTE, | ) | |
| Defendant. | ) | |

This matter is before the court on the Motion to Dismiss [DE-9] filed by Defendant Southern Research Institute ("SRI"). For the reasons stated below, the motion is ALLOWED in part and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Trana Discovery, Inc. ("Trana"), filed its first complaint against SRI on December 12, 2013 [DE-1]. Trana's claims arise out of SRI's allegedly negligent testing of potential drug therapy compounds using Trana's technology. SRI's faulty testing led to false bioactivity results, causing subsequent damage to Trana's reputation and industry prospects. In its complaint, Trana alleges that SRI failed to follow proper scientific standards, reported false results, and breached a duty of trust and confidence to Trana. Trana has brought claims against SRI for negligence, negligent misrepresentation, and constructive fraud.

Trana amended its complaint on February 24, 2014. *See* Amended Complaint [DE-7]. SRI filed the present Motion to Dismiss [DE-9] on March 11, 2014. The allegations in Trana's Amended Complaint, which the court must accept as true for purposes of this motion, show the following.

A.  **The Parties**

Trana was founded by scientists from North Carolina State University and the Lodz University of Technology in Poland. Am. Compl. [DE-7] ¶ 21. Trana now boasts an executive management team of "pharmaceutical industry veterans with over 300 years of collective experience in laboratory research, drug discovery, clinical research, finance, accounting, sales, product development, and marketing." *Id.* ¶ 22. Trana's research specialty is transfer RNA (tRNA): its founders "helped characterize the structure of tRNA, particularly of a structure called the anti-codon stem loop (ASL)." *Id.* ¶ 24.[1]

Trana's business is based around a "proprietary (patented) drug discovery technology platform that enables its partners . . . to discover new treatments for bacterial, viral, and fungal infectious diseases." *Id.* ¶ 16. Trana's technology focuses on rapidly testing large numbers of compounds and identifying those compounds that will attach to a tRNA's ASL. *Id.* ¶ 25. In the present case, the technology was used to target HIV in particular. *See id.* ¶¶ 25, 29. The technology functions by "creat[ing] a 'mimic' [probe] of the ASL used by the targeted HIV virus and attach[ing] it to synthesized RNA." *Id.* ¶ 25. The probes are then applied to thousands of compounds with the end goal of identifying "hits" (compounds that successfully inhibit the tRNA). *Id.* ¶ 26, 35. Trana states that "with reasonable care used in the scientific setting, Trana's technology is capable of identifying compounds that would direct pharmaceutical developers to a new class of HIV drugs." *Id.* ¶ 30.

Trana believed that SRI would prove to be a promising partner in carrying out bioactivity testing using Trana's technology. SRI is "an internationally recognized research and development organization intimately involved in the discovery or rejection of potential

---

[1] The ASL contains a nucleotide sequence that allows tRNA to bind to a virus, thereby facilitating a virus's ability to replicate. *See id.* That process can be disrupted by compounds that attach to the tRNA's ASL. *See id.*

treatments for dread diseases such as HIV." *Id.* ¶ 8. SRI's research is "intended to, in part, support submissions by the pharmaceutical industry to other federal agencies to market a new drug." *Id.* SRI holds itself as out as an expert in drug discovery and a scientific institution producing reliable results. *Id.* ¶¶ 42-44. Given SRI's background, Trana had high expectations for its work with SRI.

## B. The Beginning of the Parties' Relationship

In June 2006, Trana and SRI began working together pursuant to a Confidential Disclosure Agreement. *Id.* ¶ 51. Under that agreement, Trana disclosed to SRI "'confidential, proprietary, technical and business information' relating to Trana's 'HIV assay, drug discovery, synthesis, and development technologies.'" *Id.* In November 2006, "Trana and [SRI] entered into another agreement under which Trana agreed to screen 1,500 nucleoside analogs created by [SRI] . . . ." *Id.* ¶ 53. The next month, SRI issued a press release announcing "'a collaborative research agreement' with Trana 'targeting the creation of new HIV treatments.'" *Id.* ¶ 54. The companies continued their collaboration with positive results, including a study that yielded 29 hits that warranted further bioactivity tests. *Id.* ¶ 55. Trana and SRI were off and sailing.

Meanwhile, in July 2006, the National Institute of Allergy and Infectious Diseases ("NIAID"), a division of the National Institutes of Health, posted a solicitation for "contract resources to discover and develop novel agents for the prevention and treatment of infections caused by [HIV]." *Id.* ¶ 48. SRI had already determined that it would submit a proposal before the December 2007 deadline, "due in part to its knowledge of Trana and its intellectual property." *Id.* ¶ 50. Based on the ongoing research using Trana's HIV Assay, SRI submitted a response to the NIAID proposal and was soon awarded a contract in the amount of $20,198,805.00. *Id.* ¶ 56.

3
Case 5:13-cv-00848-F   Document 24   Filed 10/27/14   Page 3 of 17

After receiving the NIAID contract and in order to further study the 29 hits, "Trana and [SRI] entered into a Material Transfer and Research Agreement, under which Trana assigned to [SRI] the non-exclusive right to use the assays to determine its interest in a further business relationship between the Parties." *Id.* ¶ 57 (internal quotation marks omitted). The agreement also required SRI to "'promptly and fully disclose in writing' the results of [SRI's] research using Trana's assay." *Id.* SRI continued to conduct research using Trana's technology, and the parties began to explore "the prospect of representatives of [SRI] becoming members of Trana's Scientific Advisory Board." *See id.* ¶¶ 60-63. Despite the heretofore smooth sailing, troubled waters lay ahead.

## C. The Flawed Testing

In June 2009, SRI told Trana that, in its latest round of testing, it had registered several hits of compounds manifesting bioactivity against HIV-1 infected cells. *Id.* ¶ 64. The results were promising. *Id.* ¶ 72. But they were also wrong: various compounds that SRI reported as bioactive would later prove to be inactive, and two compounds initially reported as inactive would later emerge as the most promising compounds. *See id.* ¶¶ 65, 123-24. Trana would not discover the falsity of SRI's results until nearly three and a half years later. *Id.* ¶ 65.

Trana asserts that the false test results were due primarily to a change in the type of cells that were used to conduct the testing. *Id.* ¶¶ 66-71. Specifically, SRI used CEM cells during tests conducted in June 2009 and June 2010, while using PBMC cells during tests in December 2007 and September 2010. *See id.* ¶ 93. Trana alleges CEM cells are inferior to PBMC cells for use in the screening tests conducted by SRI. *See id.* ¶ 71. Trana further alleges that SRI failed to confirm that the CEM cell line test results would be "valid and comparable to results achieved in the previously used PBMC cell line, as required by basic principles of a sound scientific

methodology." *Id.* ¶ 67. While SRI never said that it had not conducted a validation, Trana believed that "[a]bsent testing to confirm that a new cell line would produce reliable results in the testing contemplated, such a change could not be scientifically justified." *Id.* ¶ 68. Trana asserts that SRI possessed superior knowledge concerning whether validation of the CEM line had occurred, as well as superior knowledge about the CEM line that could affect the testing. *Id.* ¶¶ 69-70.

### D. The Discovery of the Flawed Results

In September 2010, SRI informed Trana for the first time that SRI had used different cell lines between several of its studies. *Id.* ¶ 92-93. Trana questioned SRI "about the reliability of its latest results . . . , and [SRI] assured Trana that the June 2010 results . . . were accurate." *Id.* ¶ 94. Trana accepted "[SRI's] assurances that it understood the mechanisms behind the differing results, and [SRI's] assurances that it was qualified to conduct such research reliably, and indeed had special expertise in such testing." *Id.* Thereafter, based on the strength of the continuing research, Trana applied for and received a federal grant of approximately $375,000.00. *Id.* ¶ 95. In reliance on SRI's assurances and results, Trana released positive press releases and sought and received investor funding and patent protection. *Id.* ¶ 95-101.

The shoals that would finally sink the collaboration were revealed almost two years later. *Id.* ¶ 102. On June 18, 2012, SRI informed Trana that at least "one of the compounds previously identified as being bioactive was now not showing any activity at all in the repeat study." *Id.* Less than two weeks later, SRI's President and CEO called and informed Trana "that while 'cleaning up a lab' at [SRI], a 'thumb drive' was discovered with bioactivity data on compounds identified using Trana's HIV Assay, and as a result of what was discovered, [SRI] was going to repeat the bioactivity study on . . . 125 compounds" selected from a previous compound

screening. *Id.* ¶ 103.[2] On August 21, 2012, SRI informed Trana that preliminary results of the repeat study "showed that compounds identified in its June 2010 Report as being bioactive were not particularly active, and did not reach [an important threshold previously reached], a totally contradictory conclusion from the reports of its previous research as contained in the June 2010[] Report." *Id.* ¶ 107. SRI also informed Trana that several compounds that had previously displayed no bioactivity had shown potential promise in the repeat study. *Id.* ¶ 109. SRI promised to conduct further evaluations of the compounds while Trana contracted an independent virologist to perform a similar evaluation. *Id.* ¶ 114.

In November 2012, SRI reported the results of the repeat testing it had performed. *Id.* ¶ 123. For the first time, SRI reported that two hits, previously reported as inactive, were in fact very bioactive. *Id.* "Trana undertook to have an independent evaluation performed on Bioactive Hits #154 and #156 by ImQuest Biosciences, Inc." *Id.* ¶ 124. ImQuest confirmed that, contrary to SRI's 2009 reports, the two hits "were bioactive and solid 'lead hits' from which further research could produce a promising lead drug candidate." *Id.* However, as Trana reported to pharmaceutical industry representatives on "the falsity of information that Trana had previously provided, in reliance upon the reports from [SRI], but also . . . the latest discovery that Hits #154 and #156 were bioactive," Trana learned that industry interest had dried up. *Id.* ¶ 126.

On August 29, 2013, the parties entered into a tolling agreement as to their potential legal claims. *See* Tolling Agreement [DE-20-1] at 1 (Exhibit A to Trana's Memorandum of Law in Opposition to Motion to Dismiss). That agreement began tolling claims on July 25, 2013. *Id.* at 2. On December 12, 2013, Trana brought claims against SRI for (1) constructive fraud, (2) negligence, and (3) negligent misrepresentation.

---

[2] SRI has yet to provide Trana with the contents of the thumb drive. *Id.* ¶ 105.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a court must determine the legal sufficiency of the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In so doing, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). However, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009) (citing *Twombly*, 550 U.S. at 555, 570). Moreover, although the court draws all reasonable factual inferences in a plaintiff's favor, the court is not obligated to accept a complaint's legal conclusions drawn from the facts. *Iqbal*, 556 U.S. at 678. Nor must the court accept as true "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotation marks omitted).

## ANALYSIS

### A. Constructive Fraud

To establish a claim for constructive fraud, a plaintiff must show (1) that the plaintiff and the defendant were in a relationship of trust and confidence leading to a transaction (i.e., that the defendant owed the plaintiff a fiduciary duty), (2) that the defendant took advantage of the relationship during the transaction, and (3) that the defendant sought his own benefit in taking advantage of the relationship. *See Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997). "Put simply, a plaintiff must show (1) the existence of a fiduciary duty,

and (2) a breach of that duty." *Keener Lumber Co., Inc. v. Perry*, 149 N.C. App. 19, 28, 560 S.E.2d 817, 823 (2002). Without a fiduciary duty, there can be no claim for constructive fraud.

A fiduciary relationship exists where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971). The duty can arise either (1) from legal relationships, or (2) from those relationships that exist "in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). However, where there is no evidence that the defendant used the relationship to influence or control the plaintiff, no fiduciary duty will be found. *See Venturtech II v. Deloitte Haskins & Sells*, 790 F. Supp. 576, 588 (E.D.N.C. 1992), *aff'd sub nom. Heritage Capital Corp. v. Deloitte, Haskins & Sells*, 993 F.2d 228 (4th Cir. 1993), *cert. denied*, 511 U.S. 1051 (1994).

Generally, the existence of a fiduciary duty is a question of fact for the jury. *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999). However, North Carolina courts recognize an exception to that general rule: where the parties involved are "mutually interdependent businesses with equal bargaining positions who dealt at arms-length," North Carolina courts may determine—as a matter of law—that no fiduciary relationship exists. *Id.* Indeed, "[o]nly when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998). In other words, one party must *dominate* the other. *See S. Atl. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 533 (4th Cir. 2002). Because this degree of power imbalance is rare in business relationships, courts applying North Carolina law have

declined to extend the fiduciary relationship to a myriad of interdependent business relationships. *See, e.g., Broussard*, 155 F.3d at 347-48 (holding that, as a matter of law, a fiduciary duty does not extend to franchisor-franchisee relationships); *Cardiovascular Diagnostics Inc. v. Boehringer Mannheim Corp.*, 985 F. Supp. 615, 620 (E.D.N.C. 1997) (declining to find that a licensing agreement gave rise to a fiduciary duty); *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C. App. 663, 665-66, 391 S.E.2d 831, 832-33 (1990) (declining to find a fiduciary duty between a manufacturer and its exclusive distributor).

The court acknowledges that this is not a typical case. Trana is suing in tort and not in contract despite having entered into research agreements with SRI that essentially (1) allowed SRI to use Trana's technology in testing compounds for bioactivity and (2) gave Trana a proprietary interest in all of the test results. Instead of payment proffered for services provided, benefits were derived from government grants, investment capital, and the prospect of future research agreements with each other or third parties. These unique circumstances appear to have left Trana searching for a hook on which to hang its claims. Regardless, Trana will not find such a hook in its claim for constructive fraud.

After reviewing Trana's Amended Complaint in great detail, the court cannot conclude that the relationship between Trana and SRI was anything more than that of two "mutually interdependent businesses with equal bargaining positions who dealt at arms-length." *Rhone-Poulenc Agro*, 73 F. Supp. 2d at 546. SRI did not "hold all the cards," nor did it dominate the relationship. Instead, both parties were sophisticated business entities that had a great deal of technical knowledge. SRI may have known more concerning the specifics of bioactivity testing, but Trana had a team of "pharmaceutical industry veterans with over 300 years of collective experience in laboratory research, drug discovery, clinical research, finance, accounting, sales,

product development, and marketing." Am. Compl. [DE-7] ¶¶ 21-22. Even if Trana was at a disadvantage when it came to the specific technical knowledge of bioactivity testing, mere disadvantage is not enough. SRI must have dominated the relationship. And it would be difficult for a company with Trana's sophistication to be so dominated in these circumstances. Trana's allegations, even taken in the light most favorable to it, are simply insufficient to establish a fiduciary relationship.

The closest analogy the court can find to the present situation is a joint venture, although the parties' relationship still falls far short of that relationship:

> A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term.

*Pike v. Wachovi Bank & Trust Co.*, 274 N.C. 1, 8, 161 S.E.2d 453, 460 (1968). Courts have held that joint venturers owe a fiduciary duty to one another as a matter of law. *See, e.g., Rhone-Poulenc Agro*, 73 F. Supp. 2d at 547 ("[The plaintiff] is correct that a fiduciary relationship exists between members of a joint venture, as a matter of law."); *Future Plastics, Inc. v. Ware Shoals Plastics, Inc.*, 340 F. Supp. 1376, 1383 (D.S.C. 1972) ("In joint venture the participants owe one another a fiduciary duty with respect to matters related to the joint venture."). Here, however, the parties did not have a single purpose, nor did they carry on their activities for joint profit. The closest they came to a joint venture was to have an express agreement to exchange intellectual property and test results, but nothing more. On these facts, the court cannot and does not determine that the parties were engaged in a joint venture. Likewise, the court does not find that the parties owed one another a fiduciary duty under these circumstances.

Trana has failed to allege facts sufficient to establish that SRI owed Trana a fiduciary duty. As a matter of law, "no fiduciary relationship exists between mutually interdependent businesses with equal bargaining positions who deal[] at arms-length." *Rhone-Poulenc Agro*, 73 F. Supp. 2d at 546. Such is the case here.[3] Therefore, because Trana has failed to sufficiently plead that SRI owed Trana a fiduciary duty, Trana's claim for constructive fraud must be DISMISSED.

### E. Negligence

SRI does not argue that Trana has failed to sufficiently plead a claim for negligence. Instead, SRI argues that Trana's negligence claim is barred by the statute of limitations. The court agrees.

North Carolina imposes a three-year statute of limitations on negligence actions. N.C. Gen. Stat. § 1-52(5). A plaintiff thus has three years from the time a negligence claim accrues to file an action against the offending party. *See id.* "A cause of action based on negligence accrues when the wrong giving rise to the right to bring suit is committed, even though the damages at that time be nominal and the injuries cannot be discovered until a later date." *Harrold v. Dowd*, 149 N.C. App. 777, 781, 561 S.E.2d 914, 918 (2002).

Generally, North Carolina applies a discovery rule to negligence actions, tolling the statute of limitations "until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs." N.C. Gen. Stat. § 1-52(16). However, this discovery rule applies only to those cases where there is "personal injury or physical damage to claimant's property." *Id.* The discovery

---

[3] Because the court concludes, as a matter of law, that no fiduciary relationship existed between SRI and Trana, the court does not address whether SRI sought its own benefit.

rule does not apply where, as here, the "[p]laintiffs do not allege bodily harm or physical damage to Plaintiffs' property." *Birtha v. Stonemor, N.C., LLC*, 727 S.E.2d 1, 7 (N.C. Ct. App. 2012).

Because the parties' tolling agreement went into effect on July 25, 2013, any negligence claims accruing before July 25, 2010, would be barred. Trana does not dispute this. Instead, Trana makes two arguments as to why the statute of limitations should not bar its negligence claim: (1) SRI's actions constituted a continuing wrong that did not end until after July 25, 2010, or (2) the court should apply equitable estoppel to toll the statute of limitations.

### 1. Continuing Wrong

"The continuing wrong doctrine is an exception to the general rule that a cause of action accrues as soon as the plaintiff has the right to sue." *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 86, 712 S.E.2d 221, 229 (2011). The doctrine can be applied to a statute of limitations defense "*when no single incident in a chain of tortuous activity can fairly or realistically be identified* as the cause of significant harm." 54 C.J.S. *Limitations of Actions* § 223 (2014) (emphasis added). The plaintiff must show that a continuing violation resulted from continual unlawful acts as opposed to merely being the continual effects of discrete violations. *Stratton*, 211 N.C. at 86, 712 S.E.2d at 229. If the doctrine applies, the statute of limitations is effectively tolled until the offending act has ended. *See Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003). However, North Carolina courts use this exception narrowly. *Birtha*, 727 S.E.2d at 7.

Trana argues that SRI's "continuing violation" did not end until at least November 2010, when SRI reported the results of its September 2010 tests, which would place Trana's negligence claim within the three year statute of limitations period. *See* Trana's Mem. Opp. Mot. Dismiss [DE-20] at 16. However, Trana alleges that SRI conducted the September 2010 tests using

PBMC cells, not the allegedly inferior CEM cells. *See* Am. Compl. [DE-7] at ¶¶ 71, 92-93. Nowhere in its Amended Complaint does Trana allege that the PBMC cell test results were faulty. Instead, Trana places blame for SRI's false results and faulty testing squarely on the use of inferior CEM cells and the failure to validate the CEM cell tests in comparison to the PBMC cell tests. *See id.* ¶¶ 64-71, 91-94, 103-07.

Trana alleges that SRI reported the CEM cell test results—the false results—to Trana in June 2009 and June 2010. *See id.* ¶¶ 66, 107, 112-14. As a preliminary matter, those are discrete events. The continuing wrong doctrine is applied "when no single incident in a chain of tortuous activity can fairly or realistically be identified as the cause of significant harm." 54 C.J.S. § 223. Here, not only can the court readily identify the time period when SRI used the CEM cells in testing, but it can identify dates for the individual testing sessions and reports. Moreover, even if the court were to find that SRI's negligent testing with the CEM cells was a continuing wrong, the wrong would have ended in June 2010, when SRI last reported the results of tests using the allegedly inferior CEM cell line. *See id.* ¶¶ 92-93, 102-07.[4] Thus, even if the doctrine were to apply, the statute of limitations would still bar Trana's negligence claim because all events concerning the faulty CEM cell test results ended before July 25, 2010. Therefore, the continuing wrong doctrine does not save Trana's negligence claim.

---

[4] The court notes that Trana makes one allegation that "[t]he August 24, 2012, Report from [SRI] contained polar and conflicting results compared to the November 30, 2010, Report provided both to NIAID and Trana." *Id.* ¶ 111. This allegation could raise an inference that the November 30, 2010 Report was also inaccurate. However, the court believes this allegation likely refers to the June 25, 2010 Report, and that the date of November 30 is a typo—all of the surrounding allegations reference the June 25, 2010 Report and no other allegations indicate that the November 30, 2010 Report contains false results. *See id.* ¶¶ 102-04, 107, 110, 112-14. Furthermore, even if this lone allegation were to refer to the November 30, 2010 Report, that report would mark a distinct event, separate and apart from the other allegedly false tests and reports. The continuing wrong doctrine does not apply to such events.

## 2. Equitable Estoppel

Trana also argues that SRI should be equitably estopped from asserting a statute of limitations defense. A party may, under certain circumstances, invoke the doctrine of equitable estoppel to prevent a defendant from relying on a statute of limitations defense. *Miller v. Talton*, 112 N.C. App. 484, 488, 435 S.E.2d 793, 797 (1993). "Equitable estoppel is present 'when a party has been induced by another's acts to believe that certain facts exist, and that party rightfully relies and acts upon that belief to his or her detriment.'" *Salmony v. Bank of Am. Corp.*, No. COA12-1414, 2013 WL 3770688, at *8 (N.C. Ct. App. July 16, 2013) (quoting *Ussery v. Branch Banking & Trust Co.*, 743 S.E.2d 650, 654 (N.C. Ct. App. 2013)). However, the misrepresentations must specifically induce a party to delay filing suit. *Jordan v. Crew*, 125 N.C. App. 712, 720, 482 S.E.2d 735, 739 (1997). That is, where a plaintiff does not allege that its reliance upon the defendant's misrepresentations led to its failure to timely file suit, courts will not apply equitable estoppel. *See id.* If the party seeking to invoke equitable estoppel makes sufficient allegations to "raise[] a permissible inference that the elements of equitable estoppel are present . . . estoppel is a question of fact for the jury." *Talton*, 112 N.C. App. at 488, 435 S.E.2d at 797.

Trana argues that SRI should be equitably estopped from using the statute of limitations defense because (1) SRI urged and intended Trana to rely on SRI's test results, and (2) SRI later revealed that some of its previous test results (specifically those based on the CEM cell lines) were false. *See* Trana's Mem. Opp. Mot. Dismiss [DE-20] at 18-20. However, at no point does Trana allege that SRI's representations or initial position induced Trana to delay filing suit. Indeed, the cases cited by Trana all support the premise that equitable estoppel requires the party seeking to invoke equitable estoppel to have delayed filing suit based on the offending party's

actions. *See, e.g., Ussery*, 743 S.E.2d at 656-57 (applying equitable estoppel where the defendant told the plaintiff that everything would be resolved without needing to resort to litigation); *Duke Univ. v. Stainback*, 320 N.C. 337, 341, 357 S.E.2d 690, 693 (1987) (finding that the defendant's actions induced the plaintiff to "forego pursuing its legal remedy against" the defendant); *Talton*, 112 N.C. App. at 489, 435 S.E.2d at 797-98 (finding that the defendants promised to fix the problems at issue and that the plaintiffs relied upon those representations and delayed filing suit as a result); *see also Matthieu v. Piedmont Natural Gas Co.*, 269 N.C. 212, 216-17, 152 S.E.2d 336, 340-41 (1967) (declining to apply equitable estoppel where the defendant appeared to invite suit); *Bryant v. Adams*, 116 N.C. App. 448, 459-60, 448 S.E.2d 832, 838 (1994) (finding that the plaintiffs sufficiently alleged that the defendant actively "thwart[ed] discovery efforts" such that equitable estoppel could be applied to the defendant's statute of limitations defense). Because the court cannot find that SRI's misrepresentations induced Trana to delay filing suit, the court will not apply equitable estoppel to SRI's statute of limitations defense.

Given that Trana's continuing wrong and equitable estoppel arguments have failed, the court finds that Trana's claim for negligence based on events occurring before July 25, 2010, is barred by the statute of limitations. Furthermore, the court has reviewed the remaining allegations of Trana's Amended Complaint [DE-7] and finds that they are insufficient to support a claim for negligence. Therefore, Trana's claim for negligence is hereby DISMISSED in its totality.

## C.     Negligent Misrepresentation

SRI argues that Trana's claim for negligent misrepresentation is in actually a claim for negligent omission, a claim not recognized under North Carolina law. *See* SRI's Motion to Dismiss [DE-10] at 15-16; *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 202-03 (M.D.N.C.

15
Case 5:13-cv-00848-F   Document 24   Filed 10/27/14   Page 15 of 17

1997). While it is true that North Carolina courts do not recognize a claim for negligent omission, SRI ignores a host of allegations in the Amended Complaint evincing negligent misrepresentations.

SRI argues that it never "inform[ed] Trana that it had failed to validate CEM cells for use in its testing." *See* Am. Compl. [DE-7] ¶ 67; SRI's Memorandum in Support of Motion to Dismiss [DE-10] at 16. Failure to inform alone cannot form the basis of a claim for negligent misrepresentation. *See Breeden*, 171 F.R.D. at 202-03. However, the single allegation flagged by SRI is far from Trana's only allegation supporting its claim of negligent misrepresentation. Just a few paragraphs earlier, Trana alleges that "[SRI] *informed* Trana that it had tested 136 hits . . . and that several of those hits had shown bioactivity." Am. Compl. [DE-7] ¶ 64 (emphasis added). Trana continues: "[A]mong the biochemical hits . . . were two compounds, numbered 154 and 156, that [SRI] *reported* in June 2009 to be inactive . . . ." *Id.* ¶ 65 (emphasis added). Those representations would later prove false. *See id.* ¶¶ 107, 112-14, 117-18. These allegations show affirmative misrepresentations, not negligent omissions. Indeed, Trana begins its First Claim for Relief by explicitly stating (1) that "[SRI's] June 2009 Report was false in that it reported as inactive two compounds that were in fact bioactive and potential lead compounds," and (2) that "[SRI's] June 25, 2010, Report to Trana was false." *Id.* ¶¶ 130-31. Nowhere in its First Claim for Relief does Trana mention SRI's silence regarding the failure to verify the CEM cell line against the PBMC cell line. SRI cannot simply ignore the allegations of its affirmative misrepresentations and expect the court to dismiss Trana's claim for negligent misrepresentation.

As an additional note, a claim of negligent misrepresentation based on the previously discussed allegations would not accrue until discovery of the facts constituting the negligent misrepresentation. *Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 2d 592, 604 (M.D.N.C.

2011). Given that Trana alleges that SRI itself did not appear to fully discover the falsity of its results until 2012, the discovery rule would toll the statute of limitations until SRI's full disclosure of June 29, 2012. Am. Compl. [DE-7] ¶ 103. Therefore, statute of limitations does not bar Trana's claim for negligent misrepresentation.

SRI's Motion to Dismiss [DE-9] is DENIED as to Trana's claim for negligent misrepresentation.

## CONCLUSION

For the foregoing reasons, SRI's Motion to Dismiss [DE-9] is ALLOWED in part and DENIED in part. Trana's claims for constructive fraud and negligence are hereby DISMISSED. Trana's claim for negligent misrepresentation remains. The Clerk of Court is DIRECTED to continue the management of this case.

SO ORDERED.

This the 27 day of October, 2014.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge