IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-848-BO

| | | |
|---|---|---|
| TRANA DISCOVERY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| SOUTHERN RESEARCH INSTITUTE, | ) | |
| | ) | |
| Defendant. | ) | |

This cause comes before the Court on defendant's motion to strike supplemental affidavit of Dr. Wainburg, motion for summary judgment, motion to exclude expert opinions of Michael Mischke-Reeds, motion to exclude expert opinions of Mark A. Wainberg, Ph.D., and motion to strike declaration of Edward Gallagher. The appropriate responses and replies have been filed and the matters are ripe for ruling. Also pending and ripe for consideration are several motions to seal documents filed by plaintiff and defendant.

BACKGROUND[1]

I.  Procedural history

Plaintiff Trana Discovery (Trana) filed this action on December 12, 2013, alleging claims arising out of defendant Southern Research Institute's (SRI) allegedly negligent testing of potential drug therapy compounds using Trana's technology. Trana's amended complaint alleged claims for negligent misrepresentation, constructive fraud, and negligence. On October 27, 2014, the

---

[1] The Court also incorporates by reference as if fully set forth herein the factual and procedural background of this matter as provided in its October 27, 2014 order granting in part defendant's motion to dismiss. [DE 24].

Court[2] dismissed Trana's negligence and constructive fraud claims. Thereafter, Trana moved for leave to file a second amended complaint in order to add factual allegations and a claim for fraud. This motion was allowed by order entered September 29, 2015. SRI has now moved for summary judgment in its favor on all claims.[3]

II. Factual background[4]

Trana was formed to create and license assays, which are chemical tests to determine the presence, absence, or quantity of one or more components of a material. Merriam-Webster Unabridged Dictionary, available at http://unabridged.merriam-webster.com/unabridged/assay (last visited August 25, 2017). As general background, the Court notes that

> [p]harmacological research assays may be classified into three general categories. The first are biochemical assays, in which whole cells are broken down and proteins are separated, purified and test substances applied. .... The second approach, cellular assays, in contrast, involve the application of test substances to whole cells to determine the cellular response. Finally, pharmacological researchers will employ the use of animal studies and eventually human studies in their development of new pharmacological products.

*Bayer AG v. Housey Pharm., Inc.*, No. CIV. 01-148-SLR, 2003 WL 22953187, at *1 (D. Del. Dec. 4, 2003). Trana developed assays for testing compounds to determine their ability to inhibit the reproduction of pathogens in the human body by disrupting the pathogen's use of tRNA to replicate. The first of these assays that Trana created worked to detect compounds which would inhibit the human immunodeficiency virus' (HIV) interaction with a specific human tRNA protein

---

[2] United States District Judge Fox presided over this case prior to its reassignment to the undersigned on January 25, 2017.
[3] In its compliance with the Court's order to file a second amended complaint as a single document, Trana filed a second amended complaint which included claims for negligence and constructive fraud. Because those claims were previously dismissed, and Trana has not argued in opposition to summary judgment that those claims remain, they are STRICKEN from the operative complaint.
[4] Unless otherwise indicated, the following recitation of the facts is based on plaintiff's statement of dispute facts. [DE 98]. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

2

that the HIV virus uses to replicate itself. Scientists at SRI and Trana later collaborated to create a methodology for high-throughput screening of compounds using Trana's technology; the result of this work was the Trana HIV 201 High-Throughput Screening Assay (HTS Assay). The HTS Assay is a biochemical assay, meaning it does not use living cells, which identifies hit compounds that show inhibition of the HIV virus' ability to bind to a particular region of a tRNA protein. A biological assay, by comparison, is needed to determine if a hit compound identified by Trana's HTS Assay inhibits replication of HIV in a living cell. Trana contends that its HTS Assay technology can identify compounds that could direct developers of pharmaceuticals to a new class of HIV drug.

Based on research it had conducted using Trana's HTS Assay, SRI was awarded in September 2007 a research contract funded by the National Institute of Allergy and Infectious Diseases (NIAID), a division of the National Institutes of Health (NIH). The NIAID contract provided that SRI was to "develop and conduct biochemical, cell-based, and tissue-based assays to evaluate both the efficacy and toxicity of the drug substances . . ..". [DE 99-1 at SRI022754]. The contract further provided that SRI was to incorporate new technologies and strategies as they become available. *Id.* at SRI022755. Under the terms of the contract, SRI, working with Trana as the assay sponsor, was responsible for preparing the testing plan, which would be sent to the NIAID project officer for approval before any work on the contract could begin. [DE 99-4 at 10] Miller Interrog. 4. Trana was not a party to the NIAID contract; all funds paid to SRI for work under the NIAID contract were paid by NIAID. [DE 76-2] Peterson[5] Dep. at 108. The contract further prohibited SRI from initiating or conducting studies using contract funds without prior written approval by the project officer. [DE 991 at SRI022757].

---

[5] Steven E. Peterson is the chief executive officer of plaintiff Trana. [DE 99-7].

3

After the award of the NIAID contract, Trana and SRI entered into a "Material Transfer and Research Agreement" wherein SRI was required to promptly and fully disclose the results of its research using Trana's HTS Assay and all rights, title, and interest to all developments, inventions, and know-how relating to the use of Trana's assay were assigned to Trana. SRI conducted screening of compounds pursuant to the NIAID contract with the HTS Assay in a facility in Birmingham, Alabama; compounds which through testing were identified as active in the HTS Assay were then tested in human cells in a laboratory in Frederick, Maryland. The testing performed on hits identified by the HTS Assay would use one of two biological assays: CEM-SS, which are cancer cell biological assays, or peripheral blood mononuclear cell (PBMC) biological assays, which are sourced from human blood cells.

In 2008, under its contract with NIAID, SRI screened 15,000 compounds using Trana's HTS Assay and identified 164 compounds as biochemically active. These results were reported in February 2009. In April 2009, Roger Miller, the NIAID program officer assigned to the contract, and Roger Ptak from SRI discussed the next phase of testing on hits identified by the HTS Assay.

> Due to the limited contract budget available at this time for this project, Mr. Ptak proposed eliminating the expensive and time-consuming dose range study of 160 compounds and suggested that testing proceed directly to biological testing of 150 compounds in CEM cells.... I [Miller] also sent an email to Dr. Yenne [with Trana] requesting his concurrence on the study. He responded by email later that day, stating that he had a discussion with Mr. Ptak on the telephone and was in agreement with the plan.

[DE 99-4 at 11] Miller Interrog. 5.

In June 2009, SRI reported that after testing 136 hits from the preliminary screening of 15,000 compounds using Trana's HTS Assay, several of the hits had shown bioactivity against HIV-1 infected cells. SRI further reported, as is relevant to this litigation, that two compounds,

4

Hits 154 and 156, were inactive when tested; these hits would later be discovered to exhibit antiviral activity and Trana has referred to these as false negative results. SRI performed the screening reported in June 2009 using CEM-SS cell lines.

In light of the identification of apparently bioactive compounds in the 15,000 compound screen, SRI sought and received option funding under the NIAID contract to screen an additional 300,000 compounds. In August 2009, Trana and SRI executed a Technology/Materials Transfer Agreement assigning intellectual property rights related to the compounds screened under the NIAID contract to Trana. SRI was to provide all information generated from the testing to Trana as well as NIAID and Trana was permitted two years to apply for patents on any identified hit compounds after all screening and confirmatory testing was completed; the time limitation served as a reservation of rights to the government to follow up on promising leads that Trana elected not to pursue as in the public interest. [DE 99-2]; [DE 105-3]. This kind of agreement was unique between NIAID and an assay provider and it further applied retroactively to compounds tested in the 15,000 screen.

In January 2010, SRI screened 100,000 compounds using Trana's HTS Assay. In June 2010, SRI reported results from CEM-SS assays performed on compounds identified as bioactive in the January screening. The June 2010 data report identified Hits 46 and 182 as exhibiting antiviral activity. Trana applied for patents on Hits 46 and 182, but has let those patents lapse due to its later discovery that Hits 46 and 182 were false positive results. The results reported in June 2010 were based on testing performed by SRI research technician Melanie Cokonis.

Trana alleges that up until June 25, 2012, SRI continued to assure Trana that the June 2010 data was accurate, and that on June 29, 2012, Trana received information from SRI that SRI had discovered a "thumb drive" containing bioactivity data. As a result of this discovery, SRI would

repeat the bioactivity study which had been included in the June 2010 data report. SRI reported the results of retesting on August 24, 2012, including that Hits 46 and 182 were not bioactive. [DE 105-9]. The Office of Research Integrity at NIH later entered findings of research misconduct as to Ms. Cokonis specifically related to falsifying assay data submitted to NIH, including data which improperly identified Hits 46 and 182 as bioactive. [DE 102-2].[6]

### A. CEM cell lines and PBMC cell lines

CEM-SS assays are cancer cell based assays which use laboratory-adapted strains of a virus for testing. [DE 99-9] Peterson Dep. at 88; [DE 99-10] Buckheit Dep. at 109. PBMC assays are obtained from human donor blood and can be infected with clinical strains of a virus. [DE 99-10] Buckheit Dep. at 26. CEM cell screening is rapid and inexpensive, while, because the cells are from live human donors, PBMC cells present cost and variability hurdles which must be overcome prior to their use in a high-throughput screen. *Id.* at 108-09. Differences in activity between CEM and PBMC results can be substantial because CEM cells are tumor cells, which by design are highly-activated and will robustly replicate HIV. *Id.* at 109. Thus, "a compound has to be really good in order to inhibit replication in CEM cells; whereas if you move into PBMCs, a lesser active compound may look even better." *Id.* at 110. According to Dr. Buckheit,[7] it has been since the late 1990s that those familiar with the literature of HIV drug development would have been aware of the fact that the same testing performed in PBMCs and CEMs may yield different results. *Id.* at 111.

---

[6] Pursuant to the NIAID contract, SRI went on to screen the remaining 200,000 compounds with the HTS Assay in 2011 and to conduct follow-up testing on certain hit compounds identified by the HTS Assay. [DE 76-2] Peterson Dep. at 203-04. This testing is not the subject of this lawsuit.

[7] Dr. Buckheit has been proffered as an expert by plaintiff. He holds a Ph.D. in microbiology and immunology from Duke University and completed a postdoctoral fellowship at the University of North Carolina in HIV biology. Dr. Buckheit was formerly employed by SRI and in 2004 founded ImQuest, another contract research organization.

6

Dr. Miller at NIAID stated as follows regarding the potential effect of differences between CEM and PBMC cells on the identification of compounds that inhibit the role of tRNA as required for HIV propagation:

> My understanding was that CEM and PBMC assays should be equally effective at identifying compounds that inhibit the function of tRNA in HIV replication. It is generally held that testing in continuous cell lines (e.g., CEM cells) that are grown in the laboratory is cheaper and faster than testing in primary blood cells (e.g., PBMCs) that must be obtained fresh from human donors for each assay. Testing in continuous cell lines is also thought to produce more consistent results than testing in primary blood cells because these cells don't possess the biological variability of cells from various human donors. However, some investigators chose not to use continuous cell lines for testing because they represent cells that have been genetically altered to permit continuous growth.

[DE 99-4 at 14] Miller Interrog. 8. Dr. Miller further stated that, in approving SRI's plan to use CEM-SS assays as opposed to PBMC assays, such approval was done with the knowledge that the testing as proposed by Dr. Yenne at Trana, to include PBMC assays, was not supported by the contract budget and that SRI's suggestion of using CEM cells was a cost-effective option. [DE 99-4 at 22] Miller Interrog. 16.

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in

support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. . . . and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Trana's claim for negligent misrepresentation is based on both the June 2009 and June 2010 data reports; Trana's claim for fraud is based only on the June 2010 data report. Trana's claims can be summarized as follows. First, Trana claims that by conducting only CEM-SS assays and not PBMC assays on compounds identified as hits by Trana's HTS assay, SRI failed to comply with the standard of care in the industry[8] and as a result deprived Trana of the opportunity to pursue compounds which were later discovered to be active, specifically Hits 154 and 156. Trana contends that SRI had a duty to inform Roger Miller at NIAID that using CEM-SS assays alone would lead to "spurious" results and that SRI should have recommended use of PBMC assays. This theory is based in part on SRI's use of PBMC cells to test hits identified by the HTS Assay prior to SRI's work under the NIAID contract. Second, Trana claims that in June 2010 SRI reported false positive results, specifically Hits 46 and 182, as a result of its overall negligence and the fraudulent acts of its employee Ms. Cokonis. Trana contends that it acted on SRI's fraudulent testing and reporting of false positive results to its detriment, specifically incurring costs related to filing for patent protection as well as damage to its reputation.[9]

---

[8] The parties agree that for purposes of the NIAID contract SRI acted as a contract research organization (CRO).
[9] In opposition to summary judgment, Trana does not argue that it incurred reputational damages and the Court considers this theory to be abandoned. [DE 92 at 32].

8

I.   June 2009 data report, false negative results

Trana alleges that it would not have made the business or intellectual property decisions that it did had it known the truth about the methods used by SRI to perform testing on compounds identified by Trana's HTS Assay. A claim for negligent misrepresentation requires a plaintiff to show that it has justifiably relied, to its detriment, on information prepared without reasonable care, by someone who owed the plaintiff a duty of care. *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988).

A.   Motion to strike expert opinions of Mark A. Wainberg, Ph.D.

SRI seeks to exclude, *inter alia*, the opinions of Dr. Wainberg as to the applicable standards of care for a contract research organization such as SRI. Federal Rule of Evidence 702 sets out who may be qualified as an expert and permitted to testify as to his or her opinions in a case. The threshold inquiry under Rule 702 is whether the witness is qualified to render expert opinion testimony, which requires a court to determine whether the witness' knowledge, skills, and experience are sufficiently related to the issues. *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 634 (E.D.N.C. 2008) (citation omitted).

Dr. Wainberg is director of the McGill University AIDS Centre and he has personally conducted extensive research on HIV/AIDS. [DE 63-1]. In regard to the standard of care at issue in this case, Dr. Wainberg in his report opined that SRI "significantly departed from accepted practices in that it did not employ a full array of cells and cell lines that should have been used in order to ensure that the results of the research were accurately reported in the research records." *Id.* at 6. Dr. Wainberg points to SRI's primary use of cancer cells lines (CEMs) as opposed to PBMCs, noting that, had SRI initially compared its CEM results with those obtained in PBMC for the same compounds, the discrepancy between the results obtained by these different tests would

9

have been evident. Dr. Wainberg further opined that SRI could not have properly and accurately represented the results of the research without having done so. *Id.*

During his deposition, however, Dr. Wainberg made it clear that he does not work in the contract research organization industry and that he cannot answer what the standard of care is in that setting. [DE 63-2] Wainberg Dep. at 39; 97. Indeed, Dr. Wainberg stated that he "cannot answer on what is standard of care in the industry. I don't work in industry." *Id.* at 97. The Court takes Dr. Wainberg at his word, and strikes his opinion as it relates to the standard of care applicable to this case.

B. Negligent misrepresentation

Trana does not contend that SRI improperly conducted the CEM-SS assays reported in the June 2009 data report. The only issue is whether SRI breached the applicable standard of care by conducting only CEM-SS assays and not further conducting PBMC assays. The remaining experts proffered in this case come to no conclusion as to the appropriate standard of care as it relates to whether CEM or PBMC cell lines are used in this type of research. All of the professionals whose testimony is in the record seem to agree that CEM cells are less expensive and faster to test and that PBMC cells, referred to by some as the "gold standard," are more expensive but may provide more inclusive results. *See, e.g.* [DE 76-7] Buckheit Dep. at 60 ("CEMs have been a well-accepted model for screening HIV inhibitors") and 224-25 (Dr. Miller explained to Trana that switching to CEM cells would be time and cost effective, and there was no duty on SRI to perform PBMC assays without payment); [DE 76-10] Schinazi[10] Dep. at 74 ("But for testing purposes, normally, I mean, if you don't have the resources, you do CEM first. It's cheaper. And then if you see some

---

[10] Raymond Schinazi holds a Ph.D. from Bath University in chemistry and was a postdoctoral fellow at Yale. He is currently professor of pediatrics at Emory University.

10

hits, you go back to PBMCs."). No remaining expert has testified that to utilize CEM cells under this contract fell below an applicable standard of care.

Moreover, SRI's work was performed pursuant to an NIAID contract and SRI's methodology, the use of CEM cells alone, was approved by the project officer Roger Miller. Indeed, Trana has framed much of its argument in opposition to summary judgment as resting on SRI's failure to perform under the terms of the NIAID contract, of which Trana was a third-party beneficiary. *See* [DE 92 at 10-11] ("Trana is not asking Southern to do anything more than its contract with NIH required it to do."). Such argument falls squarely within a claim for breach of contract, into which Trana cannot shoehorn a claim sounding in tort. *See Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65 (1992); *see also Rountree v. Chowan Cty.*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) ("[A] viable tort action 'must be grounded on a violation of a *duty* imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties.'") (quoting *Asheville Contracting Co. v. City of Wilson*, 62 N.C. App. 329, 342 (1983). Finally, there is no evidence that SRI was under a duty to recommend to NIAID that it approve the use of PBMC cell lines as opposed to CEM-SS cell lines. Thus, Trana cannot make out a claim for negligent misrepresentation as to the June 2009 data report and false negative results.

II.     June 2010 data report, false positive results

SRI's June 2010 data report identifying false positive results also forms the basis of a claim for negligent misrepresentation as well as a claim for fraud based on Ms. Cokonis' work. A claim for fraud requires demonstration of the following essential elements: the false representation or concealment of material fact which is reasonably calculated to deceive, made with the intent to deceive, and which does in fact deceive, resulting in damage to the injured party. *Forbis v. Neal*,

11

361 N.C. 519, 527 (2007). Reliance on the alleged false representations must be deemed to be reasonable. *Id.*

SRI argues that Trana has failed to proffer sufficient evidence that it suffered damages related to any of the false positive results identified in the June 2010 data report, defeating its claims for both negligent misrepresentation and fraud. In opposition to the motion for summary judgment, Trana argues that it can establish damages from its reliance on the false positive data because it incurred expenses applying for patents on those compounds. Its specific evidence in support of these damages is contained in the declaration of Edward Gallagher, which SRI has moved to strike.

A. Motion to strike Gallagher declaration

The parties in this case engaged in a lengthy discovery period during which Trana did not come forward with evidence of patent expenses related to the false positive hits. Neither of Trana's Rule 30(b)(6) designated representatives, Edward Gallagher, Vice President for Intellectual Property and Michael Gallucci, Chief Financial Officer, could provide specific information during their depositions related to patent expenses. [DE 76-14] Gallagher Dep. at 57-60; [DE 76-15] Gallucci Dep. at 51-53. Rather, after the close of discovery and in response to SRI's motion for summary judgment, Trana filed the declaration of Edward Gallagher which reveals that "direct patent charges and fees incurred for five patents . . . as a result of Southern's misrepresentations about the compounds total about $155,273.00." [DE 104-1] Gallagher Decl. at 2. Mr. Gallagher further stated that Trana had incurred nuclear resonance imaging expenses in the amount of $24,477.00. *Id.*

Fed. R. Civ. P. 26(a)(1)(A)(iii) requires a party to disclose a computation of each category of damages claimed. Trana does not dispute that it did not provide such computation in its initial

disclosures and that it did not supplement its disclosures to provide this information during the discovery period. Fed. R. Civ. P. 37(c)(1) provides that

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Unlike other sanctionable discovery violations, "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules." *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

A court is guided by several factors in determining whether the failure to disclose evidence was unjustified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at 597 (4th Cir. 2003). Here, Trana admits that its failure to provide a specific computation of patent-related damages prior to the close of discovery was oversight, [DE 117 at 3 n.2; 6], and it was therefore unjustified. The evidence is important as it goes directly to an element of Trana's claims, and without evidence of which its claims fail.

The surprise to SRI in receiving this information after it had deposed two 30(b)(6) witnesses on this specific topic, after the discovery period had closed, and after SRI had moved for summary judgment is plain. In order to cure Trana's late disclosure the Court would be required to reopen discovery to allow Gallagher to be deposed on this topic as his declaration fails to provide much more than a lump sum amount of damages. This case was filed in December 2013, and the Court can find no justification in delaying its resolution any further. Further, Trana's broader financial disclosures made during the course of discovery do not cure its failure to provide SRI with specific information relating to the claim for patent-related damages arising from the

13

false positive hits. *See, e.g., Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2012 WL 1596722, at *1 (E.D.N.C. May 7, 2012) ("A party cannot fulfill [the Rule 26(a)(1)(A)(iii)] requirement by providing 'undifferentiated financial statements; it requires a 'computation,' supported by documents.'" (quoting *Design Strategy, Inc. v. Davis,* 469 F.3d 284, 295 (2d Cir.2006)).

The Fourth Circuit recently noted that the decisive issue in this analysis is what the late-received information actually reveals – where it reveals, for example, a *decrease* in the amount of damages claimed, and therefore "does not involve a situation in which a defendant was 'blindsided' by an expert witness' testimony that damages would be greater, or from a different source," the surprise to the defendant is not great and the Rule 37(c) sanction may not be warranted. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 193 (4th Cir. 2017). Here, however, it was not until SRI received Gallagher's declaration that it had notice of the actual amount of damages Trana would claim arising from the June 2010 data report. Trana should have known the precise amount of its damages on the day it filed its complaint, and certainly much before the close of discovery and the middle of the dispositive motions filing period.

For these reasons, the Court finds that the late disclosure by Trana was unjustified and harmful and that the sanction contemplated by Rule 37(c)(1) is appropriate in this instance. The post-discovery declaration of Edward Gallagher is hereby STRICKEN.

B. Negligent misrepresentation and fraud

As the only evidence proffered by Trana of damages flowing from the false positive hits identified in the June 2010 data report has been stricken, its claims for negligent misrepresentation and fraud fail and summary judgment in SRI's favor is appropriate.[11]

---

[11] In addition to being unable to demonstrate a specific computation of damages, it is uncontested that as early as November 2010, just five months after the June 2010 data report, SRI reported

14

## CONCLUSION

As they were previously dismissed by order of the Court, plaintiff's claims for constructive fraud and negligence are STRICKEN from the operative complaint. For the foregoing reasons, defendant's motion for summary judgment on the remaining claims for negligent misrepresentation and fraud [DE 75] is GRANTED. Defendant's motion to strike Wainberg [DE 85] is GRANTED IN PART and DENIED IN PART as MOOT. Defendant's motion to strike declaration of Edward Gallagher [DE 116] is GRANTED. Defendant's motion to strike supplemental affidavit of Dr. Wainberg [DE 63] and motion to strike Mischke-Reeds [DE 81] are DENIED as MOOT.

Also before the Court are several motions to seal. Documents filed in connection with a summary judgment motion in a civil case are subject to a more rigorous First Amendment standard when determining whether to limit a right of access of the public to the document. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). The requested sealed material includes materials provided by third-parties pursuant to subpoena which the third-parties have requested remain confidential. The parties have also tailored their requests to seal to particular exhibits or documents and have filed agreed-upon portions of many of these documents on the public record. For these reasons, the motions to seal [DE 79, 84, 95, 97] are ALLOWED.

---

that Hits 46 and 182 "displayed no antiviral activity or cytotoxicity in the PBMC assays . . . ." [DE 76-4 at 58]. It is further undisputed that Trana had access to this information. *See* [DE 76-2] Peterson Dep. at 176-77. The Court fails to see how Trana could be found to have reasonably relied on the June 2010 data in applying for patents when further testing completed just a few months later revealed the hits not to be bioactive.

15

Finally, the parties have filed a joint motion for extension of time to conduct mediation. As entry of summary judgment is appropriate, the joint motion [DE 119] is DENIED AS MOOT.

SO ORDERED, this _21_ day of August, 2017.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE